CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 2 9 2010

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| **SHIRE LLC,**<br>a Kentucky limited liability company<br><br>   Plaintiff,<br><br>v.<br><br>**TRAVIS C. MICKLE, PH.D.,**<br>a citizen of Iowa<br><br>and<br><br>**KEMPHARM, INC.,**<br>an Iowa corporation<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. _7:10-CV-00434_<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Shire LLC ("Shire"), by counsel, states the following as its Complaint

against Travis C. Mickle, Ph.D. ("Mickle") and KemPharm, Inc. ("KemPharm")

(collectively, "the Defendants").

## STATEMENT OF CASE

1.  Shire brings this action against Mickle and KemPharm for equitable relief and

monetary damages as a result of Mickle's breach of an employment agreement ("the

Employment Agreement") (attached as Exhibit 1), five patent assignments ("the Assignment

Agreements") (attached as Exhibits 2-6), a settlement document ("the Settlement

Agreement") (attached as Exhibit 7) and for KemPharm's tortious interference with the

Employment Agreement and Assignment Agreements.

## PARTIES

2.      Shire is a Kentucky limited liability company with its principal place of business in Florence, Kentucky. Shire is the successor-in-interest to New River Pharmaceuticals Inc. ("NRP"), a former Virginia corporation headquartered in Radford, Virginia. At certain times relevant to this litigation, NRP was known as or traded as Lotus Biochemical Corporation.

3.      Mickle is a citizen of Iowa. Mickle is the President and Chief Scientific Officer of KemPharm.

4.      KemPharm is an Iowa corporation with its principal place of business in Iowa City, Iowa. KemPharm also has a facility in Blacksburg, Virginia.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that the matter in controversy is between citizens of different states and exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      The Court may exercise personal jurisdiction over the defendant Mickle pursuant to Va. Code Ann. § 8.01-328.1. Mickle has also expressly consented to this Court's jurisdiction in his Employment Agreement, which stipulated that "the exclusive jurisdiction for any lawsuit brought to enforce any right[s] or obligations arising under this agreement shall be . . . the United States District Court for the Western District of Virginia." Ex. 1, Employment Agreement ¶ 13(a). Mickle reaffirmed his consent to jurisdiction in this Court when he entered into the Settlement Agreement. Ex. 7, Settlement Agreement ¶ 5.

2

7.     This Court may exercise personal jurisdiction over the defendant KemPharm pursuant to Va. Code Ann. § 8.01-328.1.

8.     Venue in this district is proper pursuant to 28 U.S.C. § 1391.

## FACTS

**A.     New River Pharmaceuticals and the Carrierwave™ Technology**

9.     NRP was a specialty pharmaceutical company founded in 1996 and headquartered in Radford, Virginia. NRP conducted the majority of its research and development activities at its facility in Blacksburg, Virginia.

10.     The NRP business model focused on developing novel, safe pharmaceuticals that were improved versions of widely-prescribed drugs in large and growing markets. Key aspects of this business strategy included a product focus that would take advantage of the shortened development and regulatory approval pathways for drug products that also enjoy intellectual property protection. NRP implemented this "prodrug" business strategy through Carrierwave™ technology, a proprietary process developed by NRP.

11.     The term Carrierwave™ refers to the process in which prodrugs are produced by the chemical attachment of a ligand, such as amino acid or polypeptide, to an active pharmaceutical ingredient ("API") in order to improve the API's pharmacological, pharmaceutical or pharmacokinetic properties. Upon administration to a patient, the API is released. This Carrierwave™ technology served as the platform on which NRP built its research and development activities.

12.     Applying Carrierwave™, NRP's research and development efforts focused on developing prodrugs of amphetamine and opioids (e.g., oxycodone and hydrocodone)

3

designed to provide overdose protection, abuse resistance and less potential for addiction while delivering efficacy comparable to the APIs on which they were based.

13.     Through its extensive research and development efforts spanning over five years, NRP developed several products utilizing the Carrierwave™ technology. During this time, NRP came to focus its research on prodrugs consisting of an API conjugated to amino acids.

14.     NRP had a number of products in its development pipeline by October 2005, in particular the following are lead compounds that incorporated the APIs of amphetamine, hydrocodone and oxycodone:

   a.   NRP104 is a prodrug of amphetamine used to treat ADHD symptoms. NRP104 became known as Vyvanse® and was approved by the FDA in early 2007. NRP104 consists of an amphetamine conjugated to an amino acid.

   b.   NRP290 is a prodrug of hydrocodone, an opioid widely used in combination with other non-opioid analgesics to treat acute pain. NRP290 consists of hydrocodone conjugated to amino acids.

   c.   NRP369 is a prodrug of oxycodone, an opioid used to treat chronic pain. NRP369 consists of oxycodone conjugated to amino acids.

15.     As part of its business plan, NRP entered into an agreement with Shire Pharmaceuticals Group, plc on January 31, 2005, to assist with certain aspects of the development of NRP104.

16.     As a result of the progression of the relationship between Shire and NRP, Shire announced on February 20, 2007, that it would acquire NRP in a $2.6 billion cash

4

transaction. This transaction closed later that year. At that time, Shire became NRP's successor-in-interest.

**B.      Mickle Joins NRP and Is Introduced to Carrierwave™**

17.     On March 5, 2001, NRP hired Mickle as a Senior Scientist, and Mickle entered into the Employment Agreement. *See* Ex. 1.

18.     The relevant provisions of Mickle's Employment Agreement are reproduced below:

> 4. Ownership of Materials.
>
> ***All*** documents, diagrams, formulations, records, customer lists, ***Discoveries (as defined in Section 7 hereof)*** . . . which in any way relate to the Company's past, present or potential business and ***which were prepared or received by Employee in the course of Employee's employment are the exclusive property of the Company.*** Employee specifically acknowledges that Employee has no ownership interests or rights of any kind in or to such materials even if Employee developed such materials.
>
> \*        \*        \*
>
> 6. Confidential Information.
>
> Employee acknowledges that some business information may not qualify as a "trade secret," but it is still uniquely valuable and important asset of the Company, and Employee holds such information in trust for the Company's sole benefit. ***Employee agrees that at all times while employed by the Employer and thereafter, Employee will not use for Employee's own personal benefit or for the benefit of others or disclose to any other person, corporation, or other entity for any reason any of the Confidential Information, without the prior written consent of the Board of Directors of the Company.*** "Confidential Information" as used in this Agreement will include: this Agreement and all provisions hereof, all information acquired by Employee from the Company, its suppliers, advertisers, customers, or others during Employee's employment which relates to the Company's past, present or potential business, such as programs, files, personnel information, Discoveries (as defined in Section 7

5

hereof) to the extent not disclosed to the public by the Company . . . the Company's past, present or future research and development, business plans or strategies, business activities or affairs, marketing plans, product development plans, production methods and plans, software and financial information.

7. Discoveries.

*All Discoveries are the exclusive property of the Company*, and Employee will promptly and fully disclose them to the Company. As used herein, the term *"Discoveries" means all discoveries, inventions, improvements, processes, ideas and names in any form, whether or not patentable or copyrightable (including records thereof), as well as all Intellectual Property (as defined herein), which relate to or are useful to the Company's business which Employee alone or with others may invent, discover, make or conceive whether the Company's facilities are used or not.* As used herein, the term "Intellectual Property" means all current and future worldwide patents and other patent rights, inventions, copyrights, trade secrets, trademarks, know-how, utility models and other intangible proprietary rights, including, without limitation, all applications and registrations with respect thereto . . . . These obligations will survive termination of employment.

*    *    *

11. Enforcement.

Employee understands and agrees that the Company will suffer irreparable harm if Employee breaches any of Employee's obligations under this Agreement, and that monetary damages will be inadequate to compensate the Company for any such violation. Accordingly, Employee agrees that in any event Employee violates or threatens to violate any of the provisions of this Agreement, the Company, in addition to all the remedies which it may have, will be entitled to temporary, preliminary, and permanent injunctions to prevent or to restrain any such actual or threatened violation by Employee, or by any or all of the employees, partners, employers, agents, or other persons, directly or indirectly acting for, or on behalf of, or with Employee. Employee consents to the issuance of such injunctions as being a reasonable measure to protect Company's rights.

Ex. 1, Employment Agreement (emphasis added).

6

17713/1/3443815v1

19.     The Senior Scientist position at NRP was Mickle's first full-time job with a pharmaceutical company after graduation.

20.     Mickle commenced his work with NRP on or about March 5, 2001, after which time NRP provided Mickle with significant training, drug development know-how and access to NRP's proprietary information, including without limitation its past, current and planned research and development activities. In particular, he was introduced to NRP's platform technology, Carrierwave™.

21.     Thereafter, Mickle was promoted to Director of Chemistry, where he directed and supervised the research activities of several research scientists and associates. The research focused on the coupling of three different APIs (amphetamine, hydrocodone and oxycodone) to one or more natural, unnatural, non-standard, or synthetic amino acids (i.e., ligands).

22.     In January 2003, Mickle became the Director of Drug Discovery and Chemical Development ("Director"). The Director's role was critical to NRP's efforts to patent and commercialize its prodrug discoveries.

23.     In June 2003, Mickle discovered the potential for the wide-ranging application of non-standard amino acids conjugated to amphetamine and narcotics (e.g., hydrocodone and oxycodone) in the prevention of abuse. Mickle and those that reported to him devoted considerable time and energy to developing, testing and analyzing the viability of amino acid conjugates as part of the drug discovery work performed at NRP.

24.     As Director, Mickle supervised all drug discovery efforts including medicinal chemistry, analytical development and biological testing, and also supervised commercial

7

process transfer, process optimization, Current Good Manufacturing Practices, synthesis and the manufacturing of several drugs.

25. Throughout his employment, NRP disclosed and made available to Mickle its business plans and strategies, its methods of operation, its know-how, its drug discovery efforts, its commercialization processes and its approach to and results from its various research and development efforts. During this same time period, Mickle contributed certain information, ideas, discoveries, inventions, processes and methods of operation directed to improving and enhancing NRP's drug development efforts, which were targeted to the conjugation of amphetamine, hydrocodone and oxycodone to one or more natural, unnatural, non-standard, or synthetic amino acids.

26. Throughout his employment with NRP, Mickle, either directly or indirectly (e.g., through scientists whose work he directed), contributed to, had access to and personal knowledge of this proprietary information and know-how, which was essential to NRP's ability to make commercially valuable decisions about which products and which combinations of actives and ligands should be pursued.

27. Among the employees that worked with and for Mickle at NRP were three scientists: Barney S. Bishop, Ph.D. (NRP Senior Scientist), Sven Guenther, Ph.D. (NRP Research Assistant and Environmental Safety Officer) and Sanjib Bera, Ph.D. (NRP Research Assistant) (hereinafter referred to as "NRP Scientists"). Additionally, Mickle's future wife, then known as Christal Miller ("Mickle's wife"), worked for NRP as a Research Scientist during Mickle's tenure at NRP.

8

28.   In connection with the commencement of their employment with NRP, each of the NRP Scientists and Mickle's wife entered into employment contracts that are virtually the same as Mickle's and obligate them to protect and preserve NRP's proprietary information, to convey to NRP all Discoveries, and to use all such information solely for the benefit of NRP.

29.   All of these NRP Scientists learned about Carrierwave$^{TM}$ while working for NRP. Some of the NRP Scientists were directly supervised by Mickle on projects that utilized the Carrierwave$^{TM}$ technology. Bishop, along with Mickle, was an inventor on the NRP patents described below, which involved the conjugation of amino acids to amphetamine.

30.   Mickle continued in this key role as Director, which carried with it significant fiduciary duties to NRP, for the remainder of his tenure with NRP, a period of nearly three years.

31.   The information described in paragraphs 23 through 26 was confidential and proprietary to NRP and was treated as such by NRP during Mickle's employment, except when NRP made the decision to make certain portions of this information public.

32.   All of the foregoing information relating to the development of prodrugs at NRP whether generated directly by Mickle, the NRP Scientists, Mickle's wife or other NRP employees at the direction of Mickle, was (and is) the exclusive property of NRP. At no time did NRP give the defendants consent to have access to or to use any of its property after Mickle's employment with NRP came to an end in October 2005.

9

**C.     Mickle's Drug Development Efforts at NRP
        Result in Multiple Patents and Patent Applications
        Applying Carrierwave™ to Amphetamine**

33.     During his employment with NRP, Mickle directed and was responsible for the

research and development that applied Carrierwave™ to amphetamine as described in, for

example:

| Patent / Application No. | Filing Date | Exhibit No. |
|---|---|---|
| 7,105,486 ("the '486 patent") | June 1, 2004 | 8 |
| 7,223,735 ("the '735 patent") | June 1, 2004 | 9 |
| 7,375,083 ("the '083 patent") | September 30, 2004 | 10 |
| 7,700,561 ("the '561 patent") | April 10, 2006 | 11 |
| 11/089,056 ("the '056 application") | March 25, 2005 | 12 |

34.     The '486, '735, '083 and '561 patents and the '056 application, all of which

show Mickle as the first named inventor, disclose amphetamine conjugated with "one or

more unnatural, non-standard, or synthetic amino acids . . . ." Ex. 8, '486 patent at col. 11, ll.

48-58; Ex. 9, '735 patent at col. 11, ll. 29-39; Ex. 10, '083 patent at col. 17, l. 59–col. 18, l. 2;

Ex. 11, '561 patent at col. 9, ll. 1-11; Ex. 12, '056 application at pp. 7-8, ¶ 175. Under

Mickle's direction and supervision, at least one employee who reported to him conjugated

one or more unnatural, non-standard, or synthetic amino acids to amphetamine.

35.     Mickle also directed and was responsible for the research and development that

applied Carrierwave™ to hydrocodone. At least one NRP employee, who worked with

10

17713/1/3443815v1

Mickle, conjugated one or more unnatural, non-standard, or synthetic amino acids to hydrocodone.

36.    Also during his employment, Mickle directed and was responsible for the research and development that applied Carrierwave$^{TM}$ to oxycodone. Under Mickle's direction and supervision, at least three NRP employees conjugated one or more unnatural, non-standard, or synthetic amino acids to oxycodone.

37.    Consistent with his Employment Agreement, Mickle executed the Assignment Agreements for the patent applications that later became the '486 and '735 patents on October 25, 2004, the '083 patent on December 4, 2004, the '561 patent on August 28, 2006, and the '056 application on April 27, 2005. Ex. 2, Mickle Assignment of U.S. Patent No. 7,105,486; Ex. 3, Mickle Assignment of U.S. Patent No. 7,223,735; Ex. 4, Mickle Assignment of U.S. Patent No. 7,375,083; Ex. 5, Mickle Assignment of U.S. Patent No. 7,700,561; Ex. 6, Mickle Assignment of U.S. Patent Application No. 11/089,056.

38.    The Assignment Agreements provided that Mickle and his co-inventors:

> invented certain new and useful improvements in and to the subject matter of [the titled application] described in [that] application;

and that Mickle and his co-inventors:

> hereby sell, *assign* and transfer unto [New River], *its successors . . . entire right, title and interest in . . . any other United States applications . . . based in whole or in part on said United States application or in whole or in part on said improvements*, any foreign applications, *including . . . international and regional applications*, based in whole or in part . . . on said improvements, and in and to *any and all letters patent*, including extensions thereof, of any country which have been or may be granted on any of the aforesaid applications or on said improvements or any parts thereof.

Exs. 2-6 (emphasis added).

11

39.     In addition, Shire has filed U.S. Patent Application No. 12/881,008 with the U.S. Patent and Trademark Office.  This application is directed to amphetamine conjugated with one or more unnatural, non-standard, or synthetic amino acids.  Mickle is a named inventor on this patent application.

**D.      Mickle Abruptly Resigns from His Employment at NRP and Thereafter Refuses to Work**

40.     Without warning, on October 11, 2005, Mickle sent a letter to Mr. Krish Krishnan ("Krishnan"), Chief Financial Officer and Chief Operating Officer of NRP, and Ms. Suma Krishnan, Vice President of Product Development of NRP, tendering his resignation effective November 9, 2005.  Mickle cited undisclosed "personal reasons" for his departure.

41.     The next day, October 12, 2005—despite the effective date stated in his resignation letter in which he would work the thirty (30) day notice period required by his Employment Agreement—Mickle refused to perform work at NRP.  In response, given the importance of his position as Director and the need to protect its valuable proprietary and confidential information, NRP terminated Mickle's employment effective immediately.

42.     Since NRP allowed Mickle to use his personal laptop computer and work from his home (at that point located in Charlottesville, Virginia), NRP was concerned that Mickle retained confidential and proprietary information regarding NRP following his termination.  During an exit interview held on October 15, 2005, Mickle agreed to return company documents and materials promptly.

43.     Following numerous subsequent communications regarding, inter alia, Mickle's claim that certain stock options should be vested, the parties with the assistance of

12

counsel entered into the Settlement Agreement dated June 12, 2006. *See* <u>Ex. 7</u>, Settlement Agreement.

44.     In the Settlement Agreement, Mickle agreed that his obligations to NRP under his Employment Agreement would continue, including his express statement that Sections 4 through 11, 13 and 14 of the Employment Agreement survived termination of his employment. *See* <u>Ex. 7</u>, Settlement Agreement ¶ 5.

45.     In the Settlement Agreement, Mickle also acknowledged that by virtue of his former position with NRP, he has knowledge of certain intellectual property developed on behalf of NRP and other important business matters that NRP considers proprietary. *See* <u>Ex. 7</u>, Settlement Agreement ¶ 6.

46.     Shortly after Mickle executed the Settlement Agreement, NRP paid Mickle $150,000 as consideration for the Settlement Agreement.

47.     Mickle agreed as part of the Settlement Agreement that if he breached any provision of the Settlement Agreement, which included the incorporated sections of the Employment Agreement, he must repay NRP liquidated damages in the sum of $149,900. *See* <u>Ex. 7</u>, Settlement Agreement ¶ 9.

**E.      Mickle Starts Competing Pharmaceutical Companies under the "KemPharm" Name**

48.     On information and belief, less than one (1) month after resigning from NRP and prior to signing the Settlement Agreement (but without the knowledge of or notice to NRP), Mickle formed a business entity, KemPharm, LLC, in Virginia. This entity was a Virginia limited liability company that was chartered on November 8, 2005, and authorized to do business in Virginia. This KemPharm, LLC listed its principal place of business as

13

Mickle's Charlottesville residence. This Virginia entity continued to exist until October 1, 2009, when its charter was cancelled.

49. On information and belief, on June 15, 2006, three days after signing the Settlement Agreement with NRP (but without the knowledge of or notice to NRP), Mickle caused a limited liability company by the name of KemPharm, LLC to be formed in Iowa (the "Iowa LLC"). The Iowa LLC listed Mickle's Iowa residence as its principal place of business.

50. On October 26, 2006, (but without the knowledge of or notice to NRP) Mickle executed Articles of Incorporation, as the incorporator, for the defendant KemPharm, an Iowa corporation. The Secretary of State of Iowa issued the defendant KemPharm its certificate of incorporation on October 30, 2006, and it became authorized to transact business at that time. Also on October 30, 2006, the Iowa LLC changed its name to Mickle Investments, LLC.

51. The defendant KemPharm describes itself as an early phase biopharmaceutical company that focuses on the discovery of new, safer therapies for ADHD, pain and cardiovascular disease. On information and belief, as further alleged below, each of the entities formed by Mickle that have traded or currently trade under the name of "KemPharm" were formed with this same intent and purpose, which was (and is) to leverage and utilize ideas, information, know-how, discoveries and confidential information learned at NRP, all of which are the exclusive property of NRP, in order to operate a research and development company that would capitalize on such NRP property.

14

52.    On information and belief, once the defendant KemPharm was officially incorporated, both KemPharm, LLC, the Virginia limited liability company, and the Iowa LLC/Mickle Investments, LLC conveyed to the defendant KemPharm whatever rights and interests each of them had in any or all research and development engaged in by Mickle and others, including his wife, who was working with him.

53.    Mickle is (and at all times has been) the President and Chief Scientific Officer of KemPharm.  Mickle's wife, now Christal Mickle, is listed as the Vice President of Corporate Affairs.

54.    On December 11, 2006, and on February 8, 2007, Mickle filed two provisional patent applications, U.S. Application Nos. 60/869,375 (Exhibit 13) and 60/888,870 (Exhibit 14), respectively, directed to the same conjugates he had responsibility for developing while employed by NRP—namely one or more unnatural, non-standard, or synthetic amino acids conjugated to amphetamine.  Like all provisional patent applications, neither of these filings were publically available at the time of filing.

55.    Shortly thereafter, (i.e., January 29, 2007, and April 5, 2007) without the knowledge or consent of either NRP or Shire, Mickle improperly assigned to the defendant KemPharm his "entire worldwide right, title and interest in and to the invention . . . or improvements of" these two provisional patent applications.  Exhibit 15, U.S. Application No. 60/869,375 Assignment; Exhibit 16, U.S. Application No. 60/888,870 Assignment.  These assignment agreements also expressly assign KemPharm rights to "any and all other applications [KemPharm] may file . . . on said invention or improvements thereof, and any

15

and all divisions, continuations, continuations-in-part, . . . and any extensions filed in the United States or any Foreign country . . . ." Ex. 15; Ex. 16.

56.    At some point, KemPharm began operations in Blacksburg, Virginia, and currently operates a facility located in the Virginia Tech Corporate Research Center in Blacksburg. Although it had been operating in the Commonwealth of Virginia for some time, on December 15, 2009, the defendant KemPharm took the steps necessary to officially become qualified to do business in Virginia and appointed a registered agent.

57.    Recently, Shire discovered that in the spring of 2007 Travis and Christal Mickle ("the Mickles") aggressively pursued hiring NRP employees and in fact ultimately hired some of them. The Mickles held interviews in Blacksburg, Virginia after inviting employees from the NRP research and development team to consider working for them.

58.    Currently, a number of former NRP employees are employed by KemPharm, including, but not limited to, the Mickles and the NRP Scientists:

   a.   Travis Mickle, Ph.D.: President and Chief Scientific Officer of KemPharm
        (former NRP Director of Drug Discovery and Chemical Development);
   b.   Christal Mickle, M.A.: Vice President of Corporate Affairs
        (former NRP Research Assistant);
   c.   Barney S. Bishop, Ph.D.: Chairman of Scientific & Medical Advisory Board at
        KemPharm (former NRP Senior Scientist);
   d.   Sven Guenther, Ph.D.: Vice President of Research at KemPharm
        (former NRP Research Assistant and Environmental Safety Officer); and
   e.   Sanjib Bera, Ph.D.: Group Leader at KemPharm
        (former NRP Research Assistant).

59.    Under Mickle's direction, and with the assistance of Christal Mickle and the NRP Scientists, KemPharm has implemented a business and development model based on what these individuals learned at NRP. Specifically, KemPharm reports that its business and

16

development model focuses on the improvement of the effectiveness and safety of existing FDA-approved drugs in established, multi-billion dollar markets. Aspects of this business strategy include reduced drug development timelines for drug products with the potential for intellectual property protection.

60. KemPharm created this business and development model utilizing what it describes as a "unique" technology, which it refers to as its ligand activated therapy (LAT) platform technology. On information and belief, LAT forms the basis for KemPharm's research and development activities.

61. However, on information and belief, KemPharm's LAT platform technology is the same as NRP's Carrierwave$^{TM}$ platform technology. Both Carrierwave$^{TM}$ and LAT are built upon the same principles:

    a.  Select an FDA-approved drug (API);
    b.  Add a ligand to the API;
    c.  Form a prodrug;
    d.  Administer the prodrug to a patient; and
    e.  Release the API.

62. Without authorization or consent, Mickle has utilized and continues to utilize ideas, discoveries, know-how and confidential information for the benefit of himself and KemPharm, which he acquired and/or developed, in whole or in part, while employed by NRP. All such material, ideas, information and discoveries are the exclusive property of NRP ("NRP Property").

63. Attempting to leverage and utilize the NRP Property, KemPharm, under Mickle's direction, has focused its efforts on the very same APIs that the Mickles and the NRP Scientists identified while employed at NRP. Moreover, Mickle has sought to couple

17

these APIs to the very same ligand, amino acids, as did NRP while the Mickles and the NRP Scientists worked for NRP.

64.  For example, KemPharm has announced that its lead compound is KP106, which KemPharm describes as a new chemical entity ("NCE") composed of the active pharmaceutical compound D-amphetamine and a ligand. Preclinical studies, according to KemPharm, suggest KP106 may have an improved side effect profile and decreased abuse potential. KemPharm reports that KP106 was created using the LAT technology. On information and belief, the ligand used in KP106 is an amino acid.

65.  Another KemPharm prodrug is KP201, which is reportedly a candidate for the treatment of pain; it is composed of hydrocodone combined with a ligand. Preclinical studies, according to KemPharm, suggest that KP201 may have reduced abuse potential compared with currently approved narcotic analgesics. KemPharm reports that KP201 was created using the LAT technology.   On information and belief, the ligand used in KP201 is an amino acid.

66.  As previously noted, beginning on December 11, 2006, Mickle has filed, as the sole inventor, a series of patent applications. Each of these applications is directed to conjugating amino acids to amphetamine, which is the very same prodrug focus he had when working for NRP. The following patents and applications are related to Mickle's two provisional patent applications, U.S. Application Nos. 60/869,375 (Ex. 13) and 60/888,870 (Ex. 14), and all, on information and belief, have been assigned by Mickle to KemPharm. *See* Exs. 15-16. These patents and patent applications, along with any other related patents

18

or patent applications (*see, e.g.*, Exhibit 17) shall be referred to as the "Disputed Patents and Patent Applications":

| Application No. | Publication No. | Publication Date | Title | Patent Number | Patent Issue Date | Assigned to Shire |
|---|---|---|---|---|---|---|
| 11/953,668 | U.S. 2008/0139653 (Exhibit 18) | 6/12/2008 | Non-Standard Amino Acid Conjugates of Amphetamine and Processes for Making and Using the Same | 7,776,917 (Exhibit 22) | 8/17/2010 | No |
| 12/028,152 | U.S. 2008/0207757 (Exhibit 19) | 8/28/2008 | Polar Hydrophilic Prodrugs of Amphetamine and Other Stimulants and Processes for Making and Using the Same | 7,772,222 (Exhibit 23) | 8/10/2010 | No |
| 12/473,903 | U.S. 2009/0234018 (Exhibit 20) | 9/17/2009 | Non-Standard Amino Acid Conjugates of Amphetamine and Processes for Making and Using the Same | Prosecution Pending | | No |
| 12/477,616 | U.S. 2009/0239949 (Exhibit 21) | 9/24/2009 | Polar Hydrophilic Prodrugs of Amphetamine and Other Stimulants and Processes for Making and Using the Same | Prosecution Pending | | No |

67.     In the later-half of 2008, Shire first became aware of U.S. Application Nos. 11/953,668 and 12/028,152 when they were published and thus became publically available as U.S. Publication Nos. 2008/0139653 (Ex. 18) and 2008/0207757 (Ex. 19). Shortly thereafter, discussions occurred between Mickle and Shire regarding KemPharm and KP106 wherein a potential business relationship was explored. When these discussions proved unsuccessful in the fall of 2009, Shire informed Mickle it would evaluate all of its options.

**F.     Shire's Evaluation Revealed Mickle's Impermissible Use of Shire's Property**

68.     Shire's evaluation revealed that the Disputed Patents and Patent Applications are based in whole or in part on the NRP '486, '735, '083 and '561 patents and the '056 application, or in whole or in part on the improvements of said patents. This intellectual

19

property is Shire's property under the Assignment Agreements and the Employment Agreement as successor-in-interest to NRP. *See* <u>Exs. 1-6</u>.

69. KemPharm claims that the research and development carried out by Mickle under these Disputed Patents and Patent Applications generated the prodrug KP106. KemPharm has also touted the speed by which it has been able to accomplish this development work that it claims is covered by intellectual property (i.e., the Disputed Patents and Patent Applications), and which has significant value (i.e., far in excess of $75,000). KemPharm is actively seeking investors or buyers for the company based in part on the commercial potential of and intellectual property covering KP106.

70. KemPharm knew of the existence of Mickle's contracts with Shire, as NRP's successor-in-interest, specifically the Assignment Agreements and his Employment Agreement, and Mickle's continuing obligations thereunder as alleged herein.

71. Despite his obligations under the Assignment Agreements (<u>Exs. 2-6</u>) to assign all patent applications, based in whole or in part, on the NRP patents as discussed above, Mickle has not assigned any of the Disputed Patents and Patent Applications to Shire as NRP's successor-in-interest. On information and belief, Mickle has instead assigned or licensed, either directly or indirectly, each of the Disputed Patents and Patent Applications to KemPharm for valuable consideration. *See* <u>Exs. 15-16</u>.

72. Mickle's failure to promptly and fully disclose, and to assign the Disputed Patents and Patent Applications to Shire constitutes a breach of the Assignment Agreements (<u>Exs. 2-6</u>) and Mickle's Employment Agreement (<u>Ex. 1</u>), and wrongful conduct by KemPharm.

20

73. Mickle's breach of the Assignment Agreements and the Employment Agreement, and KemPharm's complicity in these breaches at this point, has caused and will continue to cause Shire to suffer irreparable harm, as this intellectual property, which is based in whole or part on the earlier Discoveries that are the sole and exclusive property of Shire as NRP's successor-in-interest, is being withheld and is or may be used for unfair competitive purposes to Shire's detriment, and has or will unjustly enrich KemPharm if left unrestrained.

74. While it is not currently possible to assign a specific dollar amount to damage caused by these breaches, as the harm is irreparable, on information and belief, if left unrestrained both Mickle and KemPharm will be unjustly enriched by entering into unauthorized transactions to license or sell Shire's property for an amount that far exceeds $75,000.

75. Likewise, Mickle's breach of the Employment Agreement also constitutes a breach of the Settlement Agreement, and this breach has caused Shire as NRP's successor-in-interest to suffer damage. The parties agreed that the correct measure of damage for the separate breach of the Settlement Agreement was for Mickle to pay Shire, as NRP's successor, the sum of $149,900 as liquidated damages.

## COUNT I – BREACH OF ASSIGNMENT AGREEMENT
## OF U.S. PATENT NO. 7,105,486
### (MICKLE)

76. Shire restates the allegations stated in paragraphs 1 through 75 above, as if fully set forth below.

21

77. Mickle entered into this Assignment Agreement of U.S. Patent No. 7,105,486 (Ex. 2), while employed by and working for NRP in Virginia.

78. Shire is the successor-in-interest to NRP under this Assignment Agreement and has the legal right to enforce its provisions as the Assignee.

79. By reason of his actions as stated above, Mickle breached his contractual obligations to Shire pursuant to the Assignment Agreement of U.S. Patent No. 7,105,486 (Ex. 2). Specifically, Mickle has breached his duty to assign to Shire U.S. Patent Application Nos. 11/953,668; 12/028,152; 12/473,903; and 12/477,616 (Exs. 18-21) and U.S. Patent Nos. 7,776,917 and 7,772,222 (Exs. 22-23) as well as any related patents and patent applications ("the Disputed Patents and Patent Applications"), which are based "in whole or in part" on the subject application of the Assignment Agreement of U.S. Patent No. 7,105,486.

80. As a direct result of the breach, Shire has suffered, is suffering and will continue to suffer irreparable injury for which there is or may be no adequate remedy at law unless and until this Court awards appropriate equitable relief, which includes (a) an order rescinding any assignment or license of the Disputed Patents and Patent Applications by Mickle to KemPharm, (b) an order awarding Shire specific performance that compels Mickle and/or KemPharm to assign the Disputed Patents and Patent Applications over to Shire, and (c) an order for injunctive relief that prevents Mickle or KemPharm from taking any action that will infringe upon, impair or limit Shire's ownership of and rights to the intellectual property reflected in the Disputed Patents and Patent Applications.

22

81.     As a direct and consequential result of Mickle's breach of his contractual

obligations to Shire under the Assignment Agreement of U.S. Patent No. 7,105,486, Shire

has incurred expenses and suffered monetary damages in an amount exceeding $75,000.

## COUNT II – BREACH OF ASSIGNMENT AGREEMENT
## OF U.S. PATENT NO. 7,223,735
### (MICKLE)

82.     Shire restates the allegations stated in paragraphs 1 through 75 above, as if fully

set forth below.

83.     Mickle entered into the Assignment Agreement of U.S. Patent No. 7,223,735

(Ex. 3), while employed by and working for NRP in Virginia.

84.     Shire is the successor-in-interest to NRP under this Assignment Agreement and

has the legal right to enforce its provisions as the Assignee.

85.     By reason of his actions as stated above, Mickle breached his contractual

obligations to Shire pursuant to the Assignment Agreement of U.S. Patent No. 7,223,735

(Ex. 3). Specifically, Mickle has breached his duty to assign to Shire U.S. Patent Application

Nos. 11/953,668; 12/028,152; 12/473,903; and 12/477,616  (Exs. 18-21) and U.S. Patent

Nos. 7,776,917 and 7,772,222 (Exs. 22-23) as well as any related patents and patent

applications ("the Disputed Patents and Patent Applications"), which are based "in whole or

in part" on the subject application of the Assignment Agreement of U.S. Patent No.

7,223,735.

86.     As a direct result of the breach, Shire has suffered, is suffering and will

continue to suffer irreparable injury for which there is or may be no adequate remedy at law

unless and until this Court awards appropriate equitable relief, which includes (a) an order

23

rescinding any assignment or license of the Disputed Patents and Patent Applications by Mickle, directly or indirectly, to KemPharm, (b) an order awarding Shire specific performance that compels Mickle and/or KemPharm to assign the Disputed Patents and Patent Applications over to Shire, and (c) an order for injunctive relief that prevents Mickle or KemPharm from taking any action that will make use of, impair or limit Shire's ownership of and rights to the intellectual property reflected in the Disputed Patents and Patent Applications.

87.     As a direct and consequential result of Mickle's breach of his contractual obligations to Shire under the Assignment Agreement of U.S. Patent No. 7,223,735, Shire has incurred expenses and suffered monetary damages in an amount exceeding $75,000.

## COUNT III – BREACH OF ASSIGNMENT AGREEMENT
## OF U.S. PATENT NO. 7,375,083
### (MICKLE)

88.     Shire restates the allegations stated in paragraphs 1 through 75 above, as if fully set forth below.

89.     Mickle entered into this Assignment Agreement of U.S. Patent No. 7,375,083 (Ex. 4), while employed by and working for NRP in Virginia.

90.     Shire is the successor-in-interest to NRP under this Assignment Agreement and has the legal right to enforce its provisions as the Assignee.

91.     By reason of his actions as stated above, Mickle breached his contractual obligations to Shire pursuant to the Assignment Agreement of U.S. Patent No. 7,375,083 (Ex. 4). Specifically, Mickle has breached his duty to assign to Shire U.S. Patent Application Nos. 11/953,668; 12/028,152; 12/473,903; and 12/477,616 (Exs. 18-21) and U.S. Patent Nos.

24

7,776,917 and 7,772,222 (Exs. 22-23) as well as any related patents and patent applications ("the Disputed Patents and Patent Applications"), which are based "in whole or in part" on the subject application of the Assignment Agreement of U.S. Patent No. 7,375,083.

92.     As a direct result of the breach, Shire has suffered, is suffering and will continue to suffer irreparable injury for which there is or may be no adequate remedy at law unless and until this Court awards appropriate equitable relief, which includes (a) an order rescinding any assignment or license of the Disputed Patents and Patent Applications by Mickle to KemPharm, (b) an order awarding Shire specific performance that compels Mickle and/or KemPharm to assign the Disputed Patents and Patent Applications over to Shire, and (c) an order for injunctive relief that prevents Mickle or KemPharm from taking any action that will infringe upon, impair or limit Shire's ownership of and rights to the intellectual property reflected in the Disputed Patents and Patent Applications.

93.     As a direct and consequential result of Mickle's breach of his contractual obligations to Shire under the Assignment Agreement of U.S. Patent No. 7,375,083, Shire has incurred expenses and suffered monetary damages in an amount exceeding $75,000.

### COUNT IV – BREACH OF ASSIGNMENT AGREEMENT
### OF U.S. PATENT NO. 7,700,561
### (MICKLE)

94.     Shire restates the allegations stated in paragraphs 1 through 75 above, as if fully set forth below.

95.     Mickle entered into this Assignment Agreement of U.S. Patent No. 7,700,561 (Ex. 5), while employed by and working for NRP in Virginia.

25

96.     Shire is the successor-in-interest to NRP under this Assignment Agreement and has the legal right to enforce its provisions as the Assignee.

97.     By reason of his actions as stated above, Mickle breached his contractual obligations to Shire pursuant to the Assignment Agreement of U.S. Patent No. 7,700,561 (Ex. 5). Specifically, Mickle has breached his duty to assign to Shire U.S. Patent Application Nos. 11/953,668; 12/028,152; 12/473,903; and 12/477,616 (Exs. 18-21) and U.S. Patent Nos. 7,776,917 and 7,772,222 (Exs. 22-23) as well as any related patents and patent applications ("the Disputed Patents and Patent Applications"), which are based "in whole or in part" on the subject application of the Assignment Agreement of U.S. Patent No. 7,700,561.

98.     As a direct result of the breach, Shire has suffered, is suffering and will continue to suffer irreparable injury for which there is or may be no adequate remedy at law unless and until this Court awards appropriate equitable relief, which includes (a) an order rescinding any assignment or license of the Disputed Patents and Patent Applications by Mickle to KemPharm, (b) an order awarding Shire specific performance that compels Mickle and/or KemPharm to assign the Disputed Patents and Patent Applications over to Shire, and (c) an order for injunctive relief that prevents Mickle or KemPharm from taking any action that will infringe upon, impair or limit Shire's ownership of and rights to the intellectual property reflected in the Disputed Patents and Patent Applications.

99.     As a direct and consequential result of Mickle's breach of his contractual obligations to Shire under the Assignment Agreement of U.S. Patent No. 7,700,561, Shire has incurred expenses and suffered monetary damages in an amount exceeding $75,000.

26

17713/1/3443815v1

## COUNT V – BREACH OF ASSIGNMENT AGREEMENT
## OF U.S. PATENT APPLICATION NO. 11/089,056
### (MICKLE)

100. Shire restates the allegations stated in paragraphs 1 through 75 above, as if fully set forth below.

101. Mickle entered into this Assignment Agreement of U.S. Patent Application No. 11/089,056 (Ex. 6), while employed by and working for NRP in Virginia.

102. Shire is the successor-in-interest to NRP under this Assignment Agreement and has the legal right to enforce its provisions as the Assignee.

103. By reason of his actions as stated above, Mickle breached his contractual obligations to Shire pursuant to the Assignment Agreement of U.S. Patent Application No. 11/089,056 (Ex. 6). Specifically, Mickle has breached his duty to assign to Shire U.S. Patent Application Nos. 11/953,668; 12/028,152; 12/473,903; and 12/477,616 (Exs. 18-21) and U.S. Patent Nos. 7,776,917 and 7,772,222 (Exs. 22-23) as well as any related patents and patent applications ("the Disputed Patents and Patent Applications"), which are based "in whole or in part" on the subject application of the Assignment Agreement of U.S. Patent Application No. 11/089,056.

104. As a direct result of the breach, Shire has suffered, is suffering and will continue to suffer irreparable injury for which there is or may be no adequate remedy at law unless and until this Court awards appropriate equitable relief, which includes (a) an order rescinding any assignment or license of the Disputed Patents and Patent Applications by Mickle to KemPharm, (b) an order awarding Shire specific performance that compels Mickle and/or KemPharm to assign the Disputed Patents and Patent Applications over to Shire, and

27

(c) an order for injunctive relief that prevents Mickle or KemPharm from taking any action that will infringe upon, impair or limit Shire's ownership of and rights to the intellectual property reflected in the Disputed Patents and Patent Applications.

105. As a direct and consequential result of Mickle's breach of his contractual obligations to Shire under the Assignment Agreement of U.S. Patent Application No. 11/089,056, Shire has incurred expenses and suffered monetary damages in an amount exceeding $75,000.

## COUNT VI - BREACH OF EMPLOYMENT AGREEMENT
### (MICKLE)

106. Shire restates the allegations stated in paragraphs 1 through 75 above, as if fully set forth below.

107. Mickle entered into the Employment Agreement (Ex. 1) with NRP on or about March 6, 2001, when he commenced working for NRP in Virginia.

108. Shire is the successor-in-interest to NRP under the Employment Agreement and thereby stepped into NRP's shoes. Shire has the legal right to enforce the Employment Agreement as the "Company" or "Employer."

109. The parties specifically contemplated in Section 11 that in addition to all other remedies that might be available, Shire would be entitled to an award of all forms of equitable relief, as monetary relief would be inadequate to compensate Shire for a breach of the provisions that were designed specifically to protect its valuable property and discoveries.

110. By reason of his actions as stated above, Mickle breached his contractual obligations to Shire pursuant to the Employment Agreement (Ex. 1). Specifically, Mickle has breached Sections 4, 6 and 7 of the Employment Agreement as follows:

28

a.  Mickle has used and improperly asserted ownership over Shire's property without consent or authorization;

b.  Mickle failed to hold NRP's Confidential Information in trust for the sole benefit of NRP and it successor, Shire; and

c.  Mickle failed to promptly and fully disclose, record and assign all of the Discoveries "which relate to or are useful to" Shire's business that Mickle developed during his employment at NRP.

111.  As a direct result of these breaches, Shire has suffered, is suffering and will continue to suffer irreparable injury for which there is or may be no adequate remedy at law unless and until Shire is awarded full and complete equitable relief, including without limitation (a) an order rescinding any assignment or license of the Disputed Patents and Patent Applications by Mickle to KemPharm, (b) an order of specific performance compelling Mickle and/or KemPharm to transfer and assign the Disputed Patents and Patent Applications over to Shire, (c) an order granting injunctive relief that prevents Mickle or KemPharm (and all others acting in concert with them) from taking any action that will infringe upon, impair or limit Shire's ownership of and its unrestricted rights to any property of any kind that belongs to Shire, including, but not limited to, the intellectual property reflected in the Disputed Patents and Patent Applications, and (d) imposition of a constructive trust and/or such other equitable relief as needed to fully implement the terms of the Employment Agreement.

29

112. As a direct and consequential result of Mickle's breach of his contractual obligations to Shire under the Employment Agreement, Shire has incurred expenses and suffered monetary damages in an amount exceeding $75,000.

113. Further, as alleged, Mickle has acted in a manner that has caused Shire to seek judicial relief and to incur expenses, costs and attorney fees in connection therewith. Upon a finding of a breach or a threatened violation of the Employment Agreement and pursuant to Section 13(c) of the Employment Agreement, Shire is entitled to an award of its costs and reasonable attorney fees actually incurred in enforcing the company's rights under the Employment Agreement.

## COUNT VII - TORTIOUS INTERFERENCE WITH CONTRACT
### (KEMPHARM)

114. Shire restates the allegations stated in paragraphs 1 through 113.

115. KemPharm had knowledge of the following contracts that existed between Mickle and Shire as NRP's successor-in-interest: the Assignment Agreement of U.S. Patent No. 7,105,486 (Ex. 2), the Assignment Agreement of U.S. Patent No. 7,223,735 (Ex. 3), the Assignment Agreement of U.S. Patent No. 7,375,083 (Ex. 4), the Assignment Agreement of U.S. Patent No. 7,700,561 (Ex. 5), the Assignment Agreement of U.S. Patent Application No. 11/089,056 (Ex. 6), and the Employment Agreement signed on March 6, 2001 (Ex. 1) (collectively "the Mickle Agreements").

116. The Mickle Agreements are valid contracts that create rights which are enforceable by Shire.

117. Despite its knowledge of the existence of these contracts, and the enforceable rights of Shire as well as the continuing obligations they imposed on Mickle, KemPharm

17713/1/3443815v1

wrongfully, and with the intent to cause Mickle to breach his obligations under each of these Agreements, induced him to assign or license the Disputed Patents and Patent Applications and to disclose and use NRP Property in violation of his contractual obligations to Shire. *See* Exs. 15-16.

118.   In accepting the rights to these Disputed Patents and Patent Applications and the benefits flowing from the use of the NRP Property, KemPharm knew that Shire's rights under the Mickle Agreements would be violated, and nonetheless wrongfully induced Mickle and wrongfully accepted this valuable property, which belongs to Shire.

119.   As alleged above, Mickle did breach the Mickle Agreements and this has caused Shire to suffer and it will continue to suffer irreparable injury for which there is or may be no adequate remedy at law, unless KemPharm is permanently enjoined from continuing to interfere with its rights created by the Mickle Agreements, and is made to account for all ill-gotten gains it may have obtained by selling or attempting to license or sell property that rightfully belongs to Shire.

120.   In connection with the breach of these Mickle Agreements, KemPharm has also obtained other NRP property and the benefit of certain know-how that has permitted KemPharm to accelerate its development process far quicker than otherwise would have been possible, even though all of such NRP Property is the exclusive property of Shire.

121.   At no time did NRP or its successor Shire give Mickle or KemPharm the right to have access to or to utilize any of the NRP property.

31

122. KemPharm has damaged Shire by its actions and has been and will continue to be unjustly enriched by its wrongful and tortious interference with Shire's contractual rights under the Mickle Agreements.

123. The damage Shire has suffered as a result of this tortious interference with its contractual rights is real, and is continuing. KemPharm's wrongful acts have caused Shire to suffer and it will continue to suffer irreparable harm for which there is no adequate remedy at law, unless full and complete equitable relief is awarded against KemPharm.

124. Among the forms of equitable relief that is appropriate are the following: (a) an injunction prohibiting KemPharm and all those acting in concert with it from violating or inducing Mickle or any of the NRP Scientists from violating their Employment Agreements; (b) an order of rescission invalidating any assignment or license of the Disputed Patents and Patent Applications to KemPharm, (c) imposition of a constructive trust and/or an order of specific performance or specific restitution that requires KemPharm to transfer or assign any rights it owns or claims to own in the Disputed Patents and Patent Applications to Shire, (d) an order compelling an accounting and imposition of a construction trust of all monies KemPharm has received from third parties in connection with the Disputed Patents and Patent Applications, and requiring KemPharm to pay over any ill-gotten gains obtained from its wrongful acts, and (e) such other equitable relief as may be necessary.

## COUNT VIII - BREACH OF SETTLEMENT AGREEMENT
### (MICKLE)

125. Shire restates the allegations stated in paragraphs 1 through 75, and 106 through 113 above, as if fully set forth below.

32

17713/1/3443815v1

126. The Settlement Agreement (Ex. 7) made by NRP and Mickle on June 12, 2006, was entered into and is subject to the laws of Virginia.

127. In consideration for Mickle's obligations under the Settlement Agreement, NRP paid Mickle $150,000.

128. Shire is the successor-in-interest to NRP and has the right to enforce the provisions of the Settlement Agreement as if it were NRP.

129. In Section 5 of the Settlement Agreement, Mickle agreed to incorporate by reference Sections 4 through 11, 13 and 14 of the foregoing Employment Agreement as additional terms to the Settlement Agreement.

130. By reason of his actions as stated above, whereby Mickle breached his Employment Agreement as alleged in paragraphs 106-113 of this Complaint, Mickle has also breached his contractual obligations to Shire under the Settlement Agreement (Ex. 7).

131. Mickle agreed that if he breached this Settlement Agreement by violating the Employment Agreement, that in addition to all remedies Shire may have for the breach of the Employment Agreement, he would pay Shire (as NRP's successor) liquidated damages in the amount of $149,900.

132. Further, as alleged, Mickle has acted in a manner that has caused Shire to seek judicial relief and to incur expenses, costs and attorney fees in connection therewith. Pursuant to Section 5 of the Settlement Agreement, which incorporates Section 13(c) of the Employment Agreement, Shire is entitled to an award of its costs and reasonable attorney fees actually incurred in enforcing the company's rights under the Employment Agreement.

33

17713/1/3443815v1

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff Shire seeks the following relief as well as such other relief as the Court deems appropriate and just:

A.    An order awarding a preliminary and permanent injunction against the defendants Mickle and KemPharm, as well as all persons acting in concert with them (including, but not limited to any officer, employee, agent or other representative of KemPharm), that restrains and enjoins each of them from, directly or indirectly, (i) using, disclosing or transferring any property of any kind that belongs to Shire as described in the Employment Agreement and Assignment Agreements, including, but not limited to, the Disputed Patents and Patent Applications, or (ii) taking any other action that may make use of, impair or limit Shire's ownership of and its unrestricted rights to the intellectual property reflected in the Disputed Patents and Patent Applications or any other NRP Property;

B.    An order of rescission that invalidates any assignment or license Mickle may have executed in favor of KemPharm in connection with the Disputed Patents and Patent Applications;

C.    The imposition of a constructive trust and/or an order of specific performance or specific restitution that requires Mickle, KemPharm and/or any other third party to execute a new and valid assignment of the Disputed Patents and Patent Applications in favor of Shire (or its designee), and to return to Shire immediately all property which rightly belongs to Shire, including, but not limited to, the Disputed Patents and Patent Applications, as well as any other intellectual property, NRP Property or other discoveries as described in the Employment Agreement and Assignment Agreements;

17713/1/3443815v1

D.     An order that compels an accounting of all monies received by KemPharm, that imposes a constructive trust on all funds held or received by KemPharm that it has received from any third party as a payment of any kind for the right to purchase, use, manufacture, market, sell or distribute any prodrugs based on the Disputed Patents and Patent Applications, whether by license or otherwise, and that upon a review of the accounting, requires KemPharm to pay over to Shire all monies it has received from third parties based on or related to the Disputed Patents and Patent Applications, or other NRP Property;

E.     An order providing such other appropriate equitable relief against the defendants as may be necessary to fully enforce the provisions of the Employment Agreement and Assignment Agreements;

F.     A judgment in favor of Shire and against Mickle for $149,900 in liquidated damages for his breach of the Settlement Agreement;

G.     An order awarding pre-judgment interest, post-judgment interest and costs as may be established by the Court;

H.     All costs and expenses incurred in connection with this action including, pursuant to the terms of the Employment Agreement Section 13(c) and Settlement Agreement Section 5, Shire's reasonable attorney fees; and

I.     Such other and further relief as this Court deems just and equitable.

**SHIRE LLC**

By: _____
Of Counsel

35

17713/1/3443815v1

W. David Paxton (VSB No. 19798)
Michael J. Finney (VSB No. 78484)
GENTRY LOCKE RAKES & MOORE LLP
800 SunTrust Plaza
P.O. Box 40013
Roanoke, Virginia 24022-0013
(540) 983-9300
Fax: (540) 983-9400
david_paxton@gentrylocke.com
michael_finney@gentrylocke.com

Edgar H. Haug (*pro hac vice motion to be filed*)
Sandra Kuzmich, Ph.D. (*pro hac vice motion to be filed*)
Ami E. Simunovich (*pro hac vice motion to be filed*)
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, NY 10151
(212) 588-0800
Fax: (212) 588-0500
ehaug@flhlaw.com
skuzmich@flhlaw.com
asimunovich@flhlaw.com

Counsel for Plaintiff Shire LLC

36